[L. A. No. 17184. In Bank.—December 28, 1939.]

A. E. ENGLAND, Special Administrator, etc., Respondent, v. HOSPITAL OF THE GOOD SAMARITAN (a Corporation), Appellant.

Gibson, Dunn & Crutcher, Philip C. Sterry, Ira C. Powers and Frederic Sturdy for Appellant.

Weinmann, Quayle & Berry, as *Amici Curiae,* on Behalf of Appellant.

William K. Young for Respondent.

EDMONDS, J.—In 1935, while a patient in the Hospital of the Good Samaritan, Charles E. England was burned by hot water bottles which a nurse placed against his body, and the present appeal is from a judgment awarding him damages for his injuries. The hospital concedes the sufficiency of the evidence to establish negligence on the part of the nurse, and the only point presented for decision is whether the appellant is a charitable organization and, if so, entitled to exemption from tort liability.

This is the third appeal in the case. After the first trial of the action, the District Court of Appeal reversed a judgment for the hospital rendered upon a directed verdict.

·(*England* v. *Hospital of the Good Samaritan*, 16 Cal. App. (2d) 640 [61 Pac. (2d) 48].) In a second trial, the jury returned a verdict for the hospital but the trial court granted a motion for a new trial. Upon appeal, the order was affirmed. (*England* v. *Hospital of the Good Samaritan*, 22 Cal. App. (2d) 226 [70 Pac. (2d) 692].) The present appeal is from the judgment which followed a third trial.

Plaintiff introduced evidence tending to show that in September, 1935, he was advised he should undergo a surgical operation, and applied for admittance to the defendant hospital; that at the time he applied for admission to the Hospital of the Good Samaritan and was quoted a rate of $25 per week for hospitalization, which included room, nursing services and board. He made no inquiry and was not informed that the hospital was, or claimed to be, a charitable organization, and he had no knowledge concerning the institution's status in that regard during the time he was a patient in it. Charges were made to him at the rate quoted and he paid the bills rendered.

As a separate defense to the charges of negligence, the hospital alleged that at all times since its organization it has been a nonprofit sharing, eleemosynary, charitable institution maintained for the purpose of giving medical care to the sick and unfortunate. Upon the trial evidence was offered in support of these allegations from which the court found that in the years 1931 to 1935, inclusive, the hospital was operated for charitable purposes. Another finding is that the hospital exercised ordinary care in the selection of its employees. However, the court concluded that no charity was requested by nor extended to Mr. England and that the hospital is not entitled to exemption from liability for the injuries inflicted by its nurse.

Although the trial court found that the hospital is a charitable institution, it may reasonably be inferred from the evidence that such a character is attributable to it only because it devotes the income from its apparently very successful business to assist those who cannot pay all or part of the cost of needed medical care. The record shows that during the year in which Mr. England was injured, it had an income of $732,129, received from revenue patients, contributions from churches, returns from an endowment fund, profits from a pharmacy lunch-counter and soda fountain, and commissions received for collecting doctors' bills. In that year the

net operating profit of the hospital was $62,767; on December 31, 1935, its earned surplus was $65,470 and between 1931 and 1935 it received from operations $843,795, more than it paid out. In five years, so the record shows, it took in $2,822,674, and had $843,795 remaining after paying all expenses.

With this uncontradicted showing taken from the books of the hospital it is difficult to see how the trial court found that the organization is a charitable one. True, the record shows that in 1935 the cost of charitable work done by the hospital was $25,967, but this amount represents only the value of the services at the rates charged paying patients and not money paid out.

However, in view of the decision of this court in *Silva* v. *Providence Hospital* (*ante*, p. 762 [97 Pac. (2d) 798]), which was argued by counsel and considered concurrently with the present appeal, the question of primary importance concerns the law of the case. The hospital contends that as the trial court found that it is operated for charitable purposes, the judgment cannot be sustained because of the decisions rendered on the former appeals.

In reversing the judgment in favor of the hospital after the first trial, the District Court of Appeal said: "We cannot hold that one who, without knowledge that a hospital claims to be a charitable institution and therefore exempt from liability, applies for admission and is received as a patient, paying the regular rates at which the hospital derives a profit, is without redress for injuries occasioned by negligence on the part of the employees of the hospital on the theory that he is accepting the benefits of charity from a benefactor. Our conclusion is in line with the decision in the Stewart case. (*Stewart* v. *California Medical etc. Association*, 178 Cal. 418 [176 Pac. 46].) The trial court erred in refusing to submit to the jury the issue of plaintiff's claim that the hospital was conducted for profit and defendant's claim that it was operated only for charity." (*England* v. *Hospital of the Good Samaritan*, 16 Cal. App. (2d) 640, 643 [61 Pac. (2d) 48].)

When the case next came before the same appellate court, the order granting a new trial was affirmed upon several grounds, one of which was that a requested instruction of the plaintiff should have been given to the jury. This in-

struction was to the effect that the defense of nonliability is unavailing to a charitable organization if the patron had no knowledge concerning its character and paid the regular rates charged by it "from which it derived a profit". (*England* v. *Hospital of the Good Samaritan, supra.*) These two statements concerning the rights of the parties, says the hospital, when construed together, establish the law of the case which requires a reversal of the judgment.

■ The doctrine of the law of the case is recognized as a harsh one (2 Cal. Jur. 947) and the modern view is that it should not be adhered to when the application of it results in a manifestly unjust decision. (*United Dredging Co.* v. *Industrial Acc. Com.*, 208 Cal. 705 [284 Pac. 922].) However, it is generally followed in this state. But a court is not absolutely precluded by the law of the case from reconsidering questions decided upon a former appeal. Procedure and not jurisdiction is involved. Where there are exceptional circumstances, a court which is looking to a just determination of the rights of the parties to the litigation and not merely to rules of practice, may and should decide the case without regard to what has gone before. (*Messenger* v. *Anderson*, 225 U. S. 436 [32 Sup. Ct. 739, 56 L. Ed. 1152] ; *Seagraves* v. *Wallace*, 69 Fed. (2d) 163; *McGovern* v. *Eckhart*, 200 Wis. 64 [227 N. W. 300, 67 A. L. R. 1381].)

■ In the present appeal, rigid adherence to the law of the case would compel a most unjust decision. It is conceded that Mr. England was seriously injured while a patient in the hospital. His case has been tried three times with an appeal following each judgment. On the occasions when it was before the District Court of Appeal, the law concerning the liability of a charitable organization for tort, as declared by the courts of California, to say the least, most unsatisfactory in its statement. Following the *dicta* of *Thomas* v. *German Gen. etc. Soc.*, 168 Cal. 183 [141 Pac. 1186], and *Stewart* v. *California Medical etc. Assn.*, 178 Cal. 418 [176 Pac. 46], such institutions had been exempted from that liability in suits brought by patrons. On the other hand, the reasoning of *Phoenix Assur. Co.* v. *Salvation Army*, 83 Cal. App. 455 [256 Pac. 1106], would logically compel a contrary conclusion.

The District Court of Appeal in deciding Mr. England's case upon the first appeal took a position somewhat between

these two views. It recognized the rule but to a limited extent only, refusing to apply it to the cause of action of paying patient. ■ This court has now decided that charitable organizations are not exempt from liability for wrongs negligently committed by their employees. (*Silva* v. *Providence Hospital, supra.*) In the meantime Mr. England has passed on. To now say that his cause of action may not be determined upon the principles stated in the Silva case, notwithstanding the fact that it is decisive of all points raised by the hospital with the exception of those relating to the law of the case, would exalt form far above substance.

The judgment is, therefore, affirmed.

Curtis, J., Houser, J., Gibson, J., Carter, J., and Waste, C. J., concurred.

SHENK, J., Dissenting.—I dissent.

My views on the issue of exemption of charitable institutions from liability to the beneficiaries thereof, either pay or nonpay, for the torts of servants who have been carefully selected are expressed in my dissenting opinion in the case of *Silva* v. *Providence Hospital of Oakland,* S. F. No. 16229 (*ante,* p. 762 [97 Pac. (2d) 798].) I cannot accept the majority opinion herein which runs counter to the great weight of authority and to the established rule in this state.

The defendant hospital satisfies the requirements of a charitable institution as defined by the authorities referred to in my dissent in the Silva case, *supra.* In fact the hospital here involved was held to be exempt as a charitable institution in the case of *Shane* v. *Hospital of the Good Samaritan,* 2 Cal. App. (2d) 334 [37 Pac. (2d) 1066]. The evidence in the present case attests the correctness of that conclusion for the defendant's articles of incorporation and by-laws disclose that it was established and is maintained under the auspices of the Protestant Episcopal Church in the Diocese of Los Angeles for the purpose of affording medical and surgical aid to sick and disabled persons and to provide such persons while inmates of the hospital with the ministration of the Gospel, if they so desire. The board of directors consists of the bishop of the diocese, the rector of St. Paul's Episcopal Church and certain parishioners of the diocese. It is also declared therein, and the trial court found, that the defendant was not

organized "for the purpose of realizing profits from the operation of its hospital". In addition to the foregoing, the defendant adduced evidence tending to establish, and the trial court found, that it had no stockholders and no method of distributing profits, if any were made, and that no persons other than employees of the hospital received any salary or compensation of any kind from the defendant. It also appears from the evidence, and the trial court found, that the defendant receives and treats three classes of patients, viz., (1) indigent or charity patients who are treated without charge; (2) part charity patients who are able to pay a portion of the cost of the treatment afforded to them; and (3) pay patients financially able to pay the fees charged for their care and treatment and from which the defendant derives a "profit". Defendant also cares for patients sent by the Good Hope Clinic. The evidence also discloses, and the trial court found, that the defendant's income is derived from paying patients, contributions from Episcopal churches and returns from investment of an endowment fund. It likewise receives the proceeds from its operation of a pharmacy and lunch-counter. A financial statement put in evidence discloses that the defendant's annual operating deficit for each of the years 1931–1934, inclusive, was $32,240, $65,809, $45,246 and $3,278, respectively. In 1935, the year of plaintiff's accident, this same statement discloses a net surplus of $62,767. However, the record indicates that these figures merely disclose "the sums actually expended by the hospital . . . and *do not include the cost of free care*". The mere presence of a surplus which ultimately is employed in its general charitable purpose does not alter defendant's character as a charitable institution. (*Baylor University* v. *Boyd,* (Tex. Civ. App.) 18 S. W. (2d) 700, 701.) It was also shown herein, and the trial court found, that the average cost of treatment per day per patient was $8.70 in 1931; $8.80 in 1932; $8.09 in 1933; $7.06 in 1934, and $6.49 in 1935; and that the average weekly cost to the defendant in rendering hospitalization, nursing service, room and board to the plaintiff was $45.43— for which he paid, as already stated, $25 a week. It was further shown that indigent persons were admitted without restriction as to race, creed or color and that in 1935 the charitable work of the institution cost $25,967.30. Finally, it was shown that "the profits received from the operation of

the hospital, when any are made, are devoted to (1) the care and treatment of indigent patients unable to pay anything; (2) to the care of patients who are able to pay some amount toward their care and treatment but less than the cost thereof, and (3) to a reduction of the mortgage indebtedness and the operation of the hospital''.

In addition to the findings already mentioned, the trial court found that the ''hospital was operated by the defendant for charitable purposes'' but it was also found that plaintiff was unaware of defendant's charitable character and was not the recipient of any charity, but that, on the contrary, and like other pay patients, he had paid the charges imposed by the defendant hospital, from which it was found to have derived a ''profit'' permitting it to care for its non-pay or charity patients and to reduce its mortgage indebtedness. In the Silva case, *supra*, I pointed out that these latter elements were false quantities in the determination of whether an institution is charitable in character and entitled to exemption. The general purpose of an institution to render service, rather than to acquire and distribute profits among its members, establishes its charitable character. Here, as in the Silva case, any ''profit'' derived from pay patients ''merely served to foster the charitable objective of the institution—its general nature being that of service to the afflicted rather than the accumulation and distribution of profits''.

Rehearing denied.  Shenk, J., voted for a rehearing.