THE COMMONWEALTH OF PUERTO RICO, ETC., Plaintiff and Appellee, *v.* THE OCEAN PARK DEVELOPMENT CORPORATION ET AL., Defendants and Appellants.

No. 10452. Argued October 3, 1955.—Decided April 30, 1956.

*Brown, Newsom & Córdova* for appellants. *José Trías Monge, Attorney General,* and *Clemente Pérez Martínez* and *Jaime J. Saldaña, Assistant Attorneys General,* for appellee.

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

On November 30, 1948 the People of Puerto Rico filed a condemnation suit in the former Court of Eminent Domain to acquire approximately 21 cuerdas of land in order to construct and establish a public recreation park thereon. This land consisted of 3 adjacent parcels. One parcel was 5.7034

cuerdas, owned by Ocean Park Development Corporation hereinafter called Ocean Park. The other 2 parcels —13.9638 and 1.50 cuerdas, respectively—were owned jointly by Felipe Segarra and Eduardo G. González. The only contested issue is the amount of just compensation for the 3 parcels. After a trial on the merits, the lower court entered judgment awarding compensation to Ocean Park in the amount of $61,645.90 for its parcel and in the amount of $151,947.15 to Segarra and González for their two parcels.

The defendants appealed to this Court. We upheld the ruling of the trial court admitting Registrars' certificates in evidence in connection with the sales of similar lands. We also found no reversible error in the action of the trial court giving no probative value whatsoever to the sale by Segarra and González to Frank Ramírez de Arellano of a tract of land adjacent to the condemned land. However, we held that the trial court committed a mathematical error in calculating the average price per square meter which had been paid in the sales of similar *urbanized* lots. (Both parties agreed at the trial that the most profitable use of the condemned land was for development as urbanized lots.) We therefore remanded the case to the trial court *solely* for it to determine the amount it would award once it corrected the aforesaid mathematical error. *People* v. *Ocean Park Development*, 73 P.R.R. 345.

The defendants appealed from our judgment to the Court of Appeals for the First Circuit. In view of its conclusion that our judgment was not a final decision, the Court of Appeals dismissed the appeal for lack of jurisdiction. *Ocean Park Development Corp.* v. *People of Puerto Rico*, 204 F. 2d 371 (C. A. 1, 1953). The case was then remanded to the trial court in accordance with our opinion in 73 P.R.R. 345. The latter court held that, despite the mathematical error in its first opinion, the amounts awarded to the defendants in the original judgment were correct. Accordingly, it en-

tered judgment in favor of the defendants for the same amounts. The case is now before us on appeal by the defendants from the new judgment.

■ The first assignment is that the trial court erred in refusing to give any probative value to the sale on January 19, 1948 of 45,000 square meters of similar land adjacent to the condemned tract by Segarra and González to Ramírez for $4.50 per square meter.

The sale to Ramírez was admitted in evidence at the trial. But in its opinion the trial court found that the said sale ". . . lacks any probative value for the final determination of the market value of the property taken from the defendants." We agree—as we held in our opinion in 73 P.R.R. 345—that this action of the trial court technically did not violate the rule laid down in *Viera* v. *Heirs of Goitía*, 60 P.R.R. 637, that evidence admitted at the trial cannot be stricken after the close of the trial. Also, if the opinion of the trial court either had been silent on this question or had stated that the court had given the Ramírez sale some weight, perhaps we would have no basis on which to interfere with its ruling. But if the Ramírez sale was admissible in evidence and was entitled as a matter of law to some weight, it was erroneous for the trial court, after admitting it in evidence at the trial, to announce in its opinion that it gave the sale in question no weight whatsoever. Moreover, the defendants might have presented additional expert testimony if they had been advised at the trial of the rejection—for all practical purposes—of the Ramírez sale by the trial court. We must therefore determine if the latter acted correctly in concluding that the Ramírez sale lacked any probative value.

■ Where as here the most suitable potential use of a condemned vacant tract was development as urbanized lots, the courts admit evidence of similar sales of *developed* lots in the same general area, subtracting therefrom the costs of

development, the reduction in area resulting from subdivision, and a reasonable profit for the promoter. *United States v. Iriarte*, 166 F. 2d 800, 804 (C.A. 1, 1948); *Cementerio Buxeda v. People of Puerto Rico*, 196 F. 2d 177, 181 (C.A. 1, 1952); *People v. Ocean Park Development, supra*, pp. 358-9.[1] In addition, sales of similar *undeveloped* tracts suitable for urbanization are also admissible in evidence. In fact, provided there are no other factors which detract substantially from their similarity, sales of *undeveloped* land might under the proper circumstances be even more persuasive than sales of *developed* lots: where sales of undeveloped land are available, there is no need for an estimate of the costs of development and profit by an expert, who is at best making an informed guess. See *United States v. Miller*, 317 U.S. 369, 375; *Baetjer v. United States*, 143 F. 2d 391, 397 (C.A. 1, 1944); *United States v. Ham*, 187 F. 2d 265, 270 (C.A. 8, 1951); *P. R. Housing Authority v. Valldejuli*, 71 P.R.R. 600, 603. It follows that if the trial court erred in giving the sale to Ramírez of an adjacent tract of *undeveloped* land no probative value whatsoever, the error was prejudicial to the defendants.

■■■■ A recent, voluntary sale of similar land in the neighborhood of condemned land which is otherwise admissible in evidence on the issue of the market value of the condemned land is nevertheless excluded from evidence if the sold land was enhanced in value prior to the sale by virtue of a previous commitment of the government to take the condemned land for a public project. *United States v. Miller, supra; Shoemaker v. United States*, 147 U.S. 282; *Kerr v. South Park Commissioners*, 117 U.S. 379; Orgel on *Valuation under Eminent Domain*, 2d ed., p. 427 *et seq.*

---

[1] In fact, the first opinion of the trial court shows that it based its findings as to the market value of the condemned tract in large part on the average price per square meter of similar sales of *developed* lots in the same general area, subtracting therefrom th above-noted items. See *People v. Ocean Park Development, supra*, pp. 358-9.

See *United States* v. *Cors*, 337 U.S. 325, 332; *People* v. *Heirs of Junghanns*, 73 P.R.R. 600. The trial court admitted the Ramírez sale in evidence. But relying on *Miller* and other cases, it gave the said sale no probative value principally on the ground that prior to the sale the Ramírez tract was enhanced in value by the commitment of the government to establish a public recreation park on the condemned tract.[2]

We assume, as the trial court held, that the People of Puerto Rico was committed to the park project in 1946. See *People* v. *Ocean Park Development, supra*, pp. 352–4. Our difficulty is that we do not find in the record the kind of enhancement in value of the Ramírez tract between 1946 and the sale herein on January 19, 1948 *by virtue of the public project* which would justify giving no probative value whatsoever to the Ramírez sale as a similar sale.

The trial court found such enhancement of value by virtue of the park project. It stated, as quoted in our opinion in 73 P.R.R. at p. 353–4, that ". . . we must reach the inescapable conclusion that *one of the main considerations* that led Ramírez to pay $4.50 per square meter was the fact that the establishment of the park among the adjacent lands rendered the latter more attractive for the construction of houses for dwelling purposes." (Italics ours.)[3] We cannot accept this conclusion as the record does not furnish an adequate basis therefor.

---

[2] The *Miller* and other cases require exclusion of evidence rather than not giving it any weight. This reinforces what we have already noted: giving the Ramírez sale no weight under the circumstances of this case was just as prejudicial to the defendants as excluding it from evidence.

[3] The trial court added that Ramírez ". . . utilized it [the park] as an attraction in an advertisement published in the local newspapers on May 22, 1948 . . . ". 73 P.R.R. at 354. This newspaper advertisement merely included the statement, among a number of others, that 20 cuerdas had already been earmarked by the Government for a recreation park. We cannot agree that this fact—standing alone—shows the kind of enhancement in value of the Ramírez tract by virtue of the public park which would justify exclusion from evidence of the Ramírez sale.

The fragmentary testimony by the only witness—Ramírez—on the issue of enhancement in value cannot be properly appraised unless it is examined in the light of the other evidence. The testimony was undisputed that from 1946 to 1948 land in the area involved herein increased substantially in value due to factors wholly independent of the park project. Expert witnesses for both parties agreed that the best possible use for the condemned and adjoining lands was for development into residential and commercial lots. One expert testified without contradiction that in 1945 and 1946 war restrictions did not permit construction of new developments and values were accordingly low during that period. An expert for the Government testified that the condemned land was surrounded by three subdivisions and was located in the natural axis of the expansion of Santurce. An expert for the defendants testified without contradiction that the condemned and adjoining lands were the only lands available for development in the Santurce zone in 1948, and that there was a tremendous demand for lots in that area.

Against the foregoing background, we turn to the only testimony in the record on the issue of enhancement of value by virtue of the park project. We quote first the cross-examination on this point of Frank Ramírez de Arellano by counsel for the Government:

"Q. Mr. Ramírez, at the time when you acquired the land from Messrs. Segarra and González, did you have any knowledge of the previous reservation that the Planning Board had made as regards the condemned lands for public use?

A. The plat which they gave me already showed the park.

"Q. Did you have any information as to the fact that those lands were going to be for public use, which information was not obtainable from any other source but the plats? A. How's that?

"Q. Had you any information aside from the one given by the plat? A. I knew they were trying that the lands be not expropriated from them because they expected to sell it to me. They tried not to have the land condemned.

"Q. That knowledge you had about the reservation made of the condemned lands, was it obtained prior to the transaction for the acquisition of the Santa Teresita lands? A. Yes, sir. When I made the deal I knew that there could be no transaction for that part of the land.

"Q. Do you know if there were any public hearings held by the Planning Board so as to determine the convenience of devoting those lands for public use? A. I do not know. I attended none.

"Q. Did you know, before you made the deal, that the public use for which the condemned lands had been reserved for was the construction and building of a public park? A. I already told you that the plats indicated the park and when we built the streets . . .

"Court: That has been established. The answer admits so. Besides, he alleges that it was for that purpose. They admit all those facts.

"Mr. Córdova: We are willing to stipulate that he knew it.

"Mr. Saldaña:

"Q. Mr. Ramírez, since you had previous knowledge that that was going to be a park and knowing the lands of Santa Teresita as regards their use as land subject to development, did you take into account as a factor in said transaction the fact that on that land a public park was going to be built? A. *It would have been to my interest if the park had not been built.*

"Q. Did you take into account that fact? A. I am not quite sure in this case. *Naturally, a park helps to enhance the development, but it was such a large tract, that it took a lot of land away.*

"Court: The question is not as to what would have been most convenient to you.

"Mr. Saldaña: Did you take that factor into consideration?

"Court: *Besides, the establishment of a park of that kind helped a great deal...The benefit it gave to the neighborhood contributed to raise the value of the properties.* A. Yes, sir. Naturally.

"Court: *Your opinion is that the establishment of a public park certainly would give more value to the properties adjacent to the park.* A. Yes, sir." (Italics ours.)

Subsequently, Ramírez testified on this same subject on redirect examination by counsel for Segarra and González as follows:

"Q. Were you sure that the lands taken for park purposes would be condemned for that purpose when you offered $4.50 in the East and West Sections? A. *I hoped that the Planning Board would drop the park project.*

"Q. Did you, at any time, reserve the right to cancel your obligation to purchase at the rate of $4.50 per meter if for any reason the condemnation of the lands was dismissed?

"Mr. Saldaña: We object.

"Hon. Judge: Well, that is a question. There was evidence. The witness testified on examination by the plaintiff that, unquestionably, the value of the lands bounding upon the parcel taken would increase due to the construction of a public park. He answered in the affirmative, that there would be an increment in value. I think that the question is intended to make that clear.

"Mr. Córdova: To establish the market price. Whether that was such a dominant factor as to make him offer less or desist.

"Hon. Judge: The Court allows the question. A. *I did not reserve the right to desist.*

"Mr. Córdova: *Did you agree, in any way, to pay less than the $4.50 per meter if the land was not taken for park purposes?* A. *No, sir.*

"Mr. Saldaña: Those questions are highly leading.

"Hon. Judge: They are asked in the redirect examination. The Court allows it and will accord it the weight it deserved. Answer. A. No, sir.

"Mr. Córdova: Were you bound to purchase at $4.50, park or no park? A. I was bound to.

"Mr. Saldaña: This is evidence which arises from the very contracts.

"Hon. Judge: Precisely. He paid $4.50 when he knew that the park was to be built, approved by the Planning Board.

"Mr. Córdova:

"Q. Do you know whether Messrs. Segarra and González made any efforts in order that the lands would not be condemned? A. I understand that they made every effort.

"Q. Whether you know it.

"Hon. Judge: Of your own knowledge. A. I know.

"Mr. Córdova: *Would you have preferred, in connection with your urbanization and your business, that the lands were taken for park purposes or that they remained available for subdivision purposes?*

" . . . . . . . .

A. *I would have preferred that they were available.*

"Hon. Judge: For your business? A. Yes, sir. Because I would have built more houses.

"Mr. Saldaña: Isn't it true that the Planning Board sets apart for park purposes 5 per cent of the land sought to be subdivided and that if not this, another park would have been constructed? A. *I tried to explain this morning that when I told what I thought of the park, I referred to the park in every development. In this case they took a lot of land for ball courts, etc. But the park, the way I thought, was a small park.*

"We move for the elimination of the witness' personal opinion. The need or desirability of a park is a legislative question.

"Hon. Judge: That does not affect the testimony in the least. Proceed.

"Mr. Córdova:

"Q. Isn't it true that there can be no development today without a park? A. There can be no development without a park, because the law requires 5 per cent for park purposes.

"Q. Do you know whether in this case said 5 per cent was earmarked for park purposes? A. There are two odd cuerdas for park purposes.

"Hon. Judge: Does that appear from Exhibit 'A'? A. Yes, sir." (Italics ours.)

We cannot agree that this testimony shows sufficient enhancement of value between 1946 and January 19, 1948 *attributable to the commitment of the government to the park project* so as to deprive the admittedly voluntary, recent sale of the Ramírez tract on January 19, 1948 of all probative value on the issue of the market value of the land condemned on November 30, 1948 for the park project. It must be remembered that not every government project

enhances the value of adjacent land. On the contrary, some government projects, such as cemeteries or fire stations, may under certain circumstances decrease the value of adjacent land. And the record contains no specific, detailed evidence as to just what enhancement in value—and the extent thereof—would result for the Ramírez tract, consisting of a large number of comparatively high-priced lots, by virtue of a *potential* recreation park for which, so far as the record shows, no concrete plans have beeen proposed. It is true that the trial court, interrupting the cross-examination, *made a categorical statement of its own* that this particular park would increase the value of the Ramírez tract, to which Ramírez apparently assented. But the somewhat puzzling —although perhaps understandable—acquiescence of Ramírez in this pronouncement which the trial court itself made must be read in the context of the rest of Ramírez' testimony on this question. The witness, as we have seen, pointed out that it would have been to his interest if a park were not planned at this place; that he hoped the park project would be dropped; that he had not reserved any right to cancel his purchase or to receive a reduction in price if the park project were dropped; that with his knowledge Segarra and González endeavoured to persuade the Government to drop the park project;[4] and that when he testified, in answer to the court's own statement as to the desirability of the park, he had in mind the normal provision of the Planning Board reserving 5 per cent of the land in an urbanization for park purposes, and not a large recreation park which would presumably bring many people into the neighborhood who did not live in the urbanization.

[4] Other evidence in the record shows that Segarra and González took this step with Ramírez' cooperation. See *Segarra* v. *Planning Board*, 71 P.R.R. 139. But the testimony that the effort to persuade the Government to drop the park project was coupled with an offer by Ramírez to buy the condemned tract for $4.50 per square meter must be rejected on the ground, among others, that offers to purchase are not admissible in evidence on the issue of market value. *People* v. *Carmona*, 70 P.R.R. 292, 295.

In view of the above-quoted testimony of Ramírez read as a whole, together with the expert testimony that the increase in value of the land in this area between 1946 and 1948 was attributable to the demand for housing and commercial lots immediately after the war restrictions were lifted, we are constrained to disagree with the trial court that the park project was "one of the main considerations" that led Ramírez to pay $4.50 per square meter for 45,000 square meters of adjacent land. It follows that the trial court erred in giving *no probative value* to the Ramírez sale on the alleged ground that its value was enhanced by the park project between 1946 and January 19, 1948.[5]

In our first opinion in this case we held that certain "other factors"—in addition to the alleged increment in value of the Ramírez tract due to the park project—justified the refusal of the trial court to give any probative value whatsoever to the Ramírez sale. 73 P.R.R. at pp. 356–8. On reexamination of this question, we conclude that the trial court and this Court erred in finding that these four "other factors" required rejection of the Ramírez transaction as a recent, voluntary sale of similar land.

---

[5] In a colloquy with the trial court, counsel for Segarra and González stated: "Undoubtedly they received some benefits in the market due to the probability of having a park there. *The correct thing would be to establish whether despite the nonexistence of that park, he would have paid the same price. For Your Honor to weigh as he pleases.*" (Italics ours.) We find nothing in this statement of counsel which affects our ruling in view of our agreement in substance with the italicized portion thereof.

It should also be noted that if, as the Government asserts, it was committed to the park project early in 1946, the adjacent property —according to its theory—was enhanced in value at that time. Yet the record shows that González and Segarra bought parts of the condemned land *on subsequent dates* for comparatively modest prices considerably below what the trial court itself found in its judgment they were worth when condemned in 1948. This ratifies our view that the substantial increase in market value by 1948 of both the condemned land and the Ramírez tract was attributable almost entirely to factors other than the park project.

First, the fact that Ramírez purchased his tract on a deferred payment basis did not render the sale to him inadmissible if it otherwise conformed to the requirements of a recent, voluntary sale of similar property. *United States v. Certain Parcels of Land, etc.*, 144 F. 2d 626, 630 (C.A. 3, 1944); *Bartlett v. City of Medford*, 147 N.E. 739 (Mass., 1925); Orgel, *supra*, p. 593. The installment feature of the sale is taken into consideration in weighing the evidence of the sale when the trier of the facts is determining the *degree of similarity* of the sale. Indeed, Ramírez in his testimony admitted that the purchase on credit was one of the considerations which permitted the sale. And counsel for Segarra and González conceded at the trial that market value would be less at a cash sale than at a deferred-payment sale.[6] But the installment feature of the Ramírez sale only detracted to some extent from the degree of its similarity to the case before us; it did not require its exclusion from evidence.

Second, we fail to see how the option granted to Ramírez to purchase additional lands at the same price either affected the admissibility or destroyed completely the probative value of the sale of the 45,000 square meters tract to him. The record shows that Ramírez in fact exercised this option and at a later date purchased an additional 113,547.21 square meters. We need not determine if the latter sale was also evidence of the market value of the condemned land. It is enough to say that it furnishes no reason for excluding or giving no probative value whatsoever to the sale of 45,000 square meters on January 19, 1948 which we are now considering.

---

[6] The example he gave was that under the circumstances of this case the court might find a market value of $4.25 per square meter of the Ramírez tract rather than $4.50 per square meter due to the deferred-payment provision. The trial court could, of course, find that this *and other factors* would make the condemned tract worth even less.

Third, the obligation of the vendors to obtain approval of the development plans and the fact that they had paid $8,000 therefor likewise do not require total rejection of the Ramírez sale. The sum of $8,000 should be deducted from the sales price since plans for development—as the defendants concede—are generally paid for by the developer. But once this sum is deducted, the fact that the Ramírez sale was conditioned on approval of the development plans does not make it an inadmissible sale in view of the undisputed testimony that the Ramírez tract was suitable for subdivision into residential lots.

Fourth, the warranty in case of eviction merely restates the conditions which govern sales of real estate under § § 1350, 1365 and 1367 of the Civil Code, 1930 ed., and therefore had no effect on the admissibility in evidence or probative value of the Ramírez sale.

We are not to be understood as holding that the Ramírez sale is controlling as to the value of the condemned land. We hold only that the trial court erred in giving it no weight whatsoever as a similar—although not identical—sale. The degree of similarity is for the trial court to determine, after weighing all the evidence. It is the duty of the trial court to give the Ramírez sale some weight—after reducing the price paid by Ramírez because of the installment nature of the sale and the acquisition of the development plans—together with all the other relevant testimony in the case. Whether the Ramírez sale is to be given decisive —or only substantial—weight is in final analysis a matter for decision by the trial court.

In our first opinion in this case we approved the ruling of the former Condemnation Court that the Ramírez sale was entitled to no weight whatsoever. 73 P.R.R. 345. The Government contends in this second appeal that our first opinion is "the law of the case" on this point. The

trial court was of course required on remand to follow our ruling to that effect. *Lluberas* v. *Mario Mercado e Hijos*, 77 P.R.R. 432, and cases cited; *Tartak* v. *District Court and Cruz, Int.*, 74 P.R.R. 805, 812–5. Also, generally speaking, when a question has been determined in a previous appeal to this Court, under the doctrine of the law of the case we do not reexamine it in a subsequent appeal of the same case. *Esprívalo* v. *Cerezo*, 47 P.R.R. 401; *Olmedo* v. *Rivera*, 65 P.R.R. 45, 52; *West India Oil Co. (P.R.)* v. *Buscaglia, Treas.*, 68 P.R.R. 733, 734; *Lluberas* v. *Mario Mercado e Hijos*, *supra*. But the latter general rule is not an inexorable command. It ". . . expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power". *Messenger* v. *Anderson*, 225 U. S. 436, 444. In many jurisdictions a prior decision will not operate as the law of the case in a subsequent appeal when its application would produce "manifestly unjust" results. *Law of the Case*, 5 Stan. L. Rev. 751, 755–6; *Note, Successive Appeals and the Law of the Case*, 62 Harv. L. Rev. 286, 287; *England* v. *Hospital of the Good Samaritan*, 97 P. 2d 813 (Cal., 1939); *Standard Oil Co.* v. *Johnson*, 132 P. 2d 910 (Cal., 1942); *Mangold* v. *Bacon*, 141 S.W. 650 (Mo., 1911). See *Annotation*, 118 A.L.R. 1286. We do not stop to determine whether such an exception to the rule of the law of the case should be adopted in this jurisdiction. *Cf.* Note, *Successive Appeals and the Law of the Case*, 62 Harv. L. Rev. 286; *Law of the Case*, 5 Stan. L. Rev. 751, 764–7; *Dictograph Products Co., Inc.* v. *Sonotone Corp.*, 131 F. 2d 230 (C.A. 2, 1956), 24 L.W. 2359.[7] Here, since the de-

---

[7] Compare also the language in *United States* v. *Iriarte*, *supra* —which was the second appeal in that case—at p. 802. "The landowners' appeal from the present judgment entered according to this finding raises no question that we have not already considered. Since no new evidence has been offered or new authorities cited it will suffice for us to say that we see no reason to change or modify the views expressed in our former opinion."

fendants' land was condemned prior to 1952, the admissibility in evidence of the Ramírez sale may perhaps involve a Federal question under the *Buxeda* case, which was decided by the Court of Appeals for the First Circuit after our first opinion in this case. See concurring opinion of Chief Judge Magruder, in which Judge Woodbury concurred, in *Cementerio Buxeda* v. *People of Puerto Rico, supra*, 181. Under these circumstances we think it will conclude this case —which has already been appealed to the Court of Appeals once and to this Court twice—more quickly to correct the error we committed in the first appeal rather than to adhere to our original mistaken view under the doctrine of the law of the case which, after all, has as its primary purpose the earliest possible termination of litigation. We shall therefore not adhere under the law of the case to our ruling in 73 P.R.R. 345 as to the Ramírez sale. Instead we now hold as already noted that on remand the trial court must give the Ramírez sale some weight.

The defendants also assign as errors: (*a*) the refusal of the trial court to increase the amount of the judgment once the mathematical error pointed out in 73 P.R.R. 345 was corrected; (*b*) the action of the trial court in averaging the average price per square meter at which a number of similar urbanized lots were sold instead of obtaining the average sales price thereof by dividing the total price received for all the lots by the total area of land sold. We find no reversible error in these actions of the trial court, particularly as it will be required on remand to give some weight to the Ramírez sale.

The defendants also contend that the ruling of the trial court that the Ramírez sale had no probative value violated various provisions of the former Organic Act and of the Commonwealth and Federal Constitutions. In view of our holding directing the trial court to give some weight to the

Ramírez sale, we do not reach the constitutional questions. raised by the defendants.

The judgment of the Superior Court will be reversed and the case remanded for new findings of fact, conclusions of law, and a judgment consistent with this opinion.

Mr. Justice Negrón Fernández and Mr. Justice Saldaña took no part in the decision of this case.