[Civ. No. 25423. Second Dist., Div. Two. Mar. 5, 1962.]

RUTH M. HILTON, Plaintiff and Respondent, v. ROLLIN L. McNITT, as Executor, etc., Defendant and Appellant.

Edythe Jacobs for Defendant and Appellant.

Richards, Watson, Smith & Hemmerling for Plaintiff and Respondent.

ASHBURN, J.—Rollin L. McNitt, as executor of the will of Hal H. Hilton, deceased, appeals from a judgment in favor of decedent's divorced wife establishing and allowing her claim for $7,500 against his estate, which claim grew out of a property settlement agreement. It was made on July 25, 1953; Mr. Hilton died July 25, 1954, and Mrs. Hilton remarried on September 18, 1954. The judgment now on appeal was rendered after a second trial of the action.

The troublesome terms of the agreement are the following: "RUTH M. HILTON wife and HAL H. HILTON husband, hereby agree that . . . it is their mutual desire to effect a final and complete settlement of their respective property rights with reference to their marital status and to each other, and to effectuate such final and complete settlement they agree particularly as follows: I. Husband shall pay to wife for her support and maintenance $300 a month, payable on the first of each and every month commencing with the 1st day of August, 1953, and continuing until the first day of July 1956." Other pertinent provisions are set forth in footnote 1.

---

[1]It is agreed that certain real property on Lake Hollywood Drive, in Los Angeles, is separate property of the wife; that all furniture and furnishings of the home, part of which was community property, should go to her; that she should have the 1952 Cadillac and the husband the 1948 Cadillac. He also agreed to pay to Penn Mutual Life Insurance Company, within two years, a loan of $3,500 and to pay the interest meantime; also to pay current household bills and small debts to stores, etc. and certain insurance premiums amounting to $210 which would be due on August 11, 1953; also to pay to James V. Brewer, attorney for the wife, $750 in installments. Paragraph VIII: "Wife does hereby sell, assign, transfer, convey and set over to the husband, all commissions and retained commissions which husband has with his employer, including a

Having filed an action for divorce, Mrs. Hilton obtained an order to show cause re attorney fees, court costs, alimony pendente lite and allowance for support, returnable on Monday, July 27, 1953. The agreement was made on Saturday, July 25th. On the same day the parties executed a stipulation drawn by Mr. Brewer, the wife's attorney, which was entitled "Stipulation in re alimony, attorney fees, court costs, title and possession of property." It follows generally the terms of the agreement but says in paragraph 1: "That the defendant HAL H. HILTON shall pay to the plaintiff RUTH M. HILTON the sum of THREE HUNDRED AND No/100 DOLLARS ($300.00), per month, commencing on August 1, 1953, and continuing thereafter on each and every month, on the first day of such month, until the first day of July, 1956"—nothing about "support and maintenance." The stipulation was endorsed by the trial judge, "approved and so ordered." The interlocutory judgment, which was granted on August 21, 1953, says: "It is further ordered that defendant pay to the plaintiff the following sums: $300.00 per month commencing October 1st, 1953, and on the 1st day of each month thereafter until the 1st day of July, 1956"—nothing about support and maintenance.

At the time of Mr. Hilton's death there was one $300 payment past due. Mrs. Hilton (now Mrs. Tracy), seasonably filed a claim against the estate for $7,500, representing the entire amount past due and thereafter to accrue under the

retained commission which the husband represents to be the sum of $9000." The wife agrees to make payments due or to become due on the Lake Hollywood Drive property. Paragraph X: "Each of the parties in consideration of the agreements of the other herein expressed hereby waives, releases and relinquishes to the other all claims each may now have, or might hereafter otherwise acquire against the other, as husband or wife, or otherwise, arising out of the marital relation." Paragraph XI: "Each party does hereby release, relinquish and waive to the other any and all claims he or she may have, or may hereafter acquire against the other except as herein specified, for support and maintenance, or attorney's fees and costs, or otherwise, and does hereby release, relinquish and waive all rights to administer upon the estate of the other after the death of such other, and does release, relinquish and waive unto such other party and his or her successors and next of kin or heirs at law any right or claim for family allowance, homestead, support or maintenance, or otherwise, against such other's estate, and agrees not to hereafter claim any interest in the other's property." Paragraph XIII: "All property, whether real, personal or mixed, which the parties severally now hold, or may acquire by virtue of or pursuant to this agreement, together with any increment thereon, and all property which either of the parties hereto may hereafter acquire, shall be and remain the separate property and estate of the party so holding, acquiring or to acquire the same, free from any claim or claims of the other." Paragraph XVI: "This agreement may, subject to the court's approval, be made a part of any decree of divorce between the parties."

agreement. It was allowed to the extent of $300 only, whereupon this action was brought.

Upon a first trial the court held: "[T]hat said agreement compromised and settled the community property rights of the parties, which rights and the extent of the community property were in dispute; that the parties to said contract intended said provision for $300 per month to be and the same was an indivisible part of said property settlement agreement; that said contract was and is an inseverable and integrated property settlement agreement," and "[i]t is not true that said contract obligation to pay the sum of $300 per month to plaintiff was one for support or maintenance as distinguished from a contractual obligation in lieu of community property rights. . . ." Judgment was rendered in favor of plaintiff pursuant to the court's conclusion that "the provision in said contract for payment of the sum of $300 per month, by Hal H. Hilton to plaintiff, to and including July, 1956, was not terminated by the death of the decedent or by the remarriage of the plaintiff, and said provision is binding upon and an obligation of decedent's estate."

Upon appeal the Supreme Court ruled as matter of law that an integrated property settlement agreement made after the effective date of the amendment of 1951 to section 139, Civil Code, is governed by said amendment, the pertinent portion of which reads: "Except as otherwise agreed by the parties in writing, the obligation of any party in any decree, judgment or order for the support and maintenance of the other party shall terminate upon the death of the obligor or upon the remarriage of the other party." The court in its opinion (*Hilton* v. *McNitt*, 49 Cal.2d 79 [315 P.2d 1]), said at page 81: "The executor contends that an integrated property settlement agreement is subject to section 139 of the Civil Code as amended in 1951 and that provisions in a property settlement agreement or in a decree for support and maintenance terminate on death or remarriage unless there is a provision in the agreement or decree which negates the intention that the payments should so terminate. With this contention we agree." At page 82: "Inasmuch as the amendment is specific to the effect that *'Except as otherwise agreed by the parties in writing'* the obligation of the husband shall cease upon his death or the remarriage of the wife we must hold that since neither the agreement nor the decree here provided that the monthly support payments were to continue beyond the death of the obligor or the remarriage of the obligee plaintiff may

not prevail except for the month which was due and owing prior to decedent's death. . . . In view of the language of the amendment that 'except as otherwise agreed in writing' the payments for support and maintenance terminate upon the death of the obligor or remarriage of the wife we are of the opinion that such payments terminated upon the death of the obligor. We hold, therefore, that the 1951 amendment to section 139 is applicable whether or not the property settlement agreement is integrated and inseverable. In other words, if monthly payments are provided for support and maintenance or alimony such payments will cease by force of the language of section 139 of the Civil Code unless the parties agree in writing that the payments are to continue despite the remarriage of the wife or the death of the husband.'' Three justices joined in a concurring and dissenting opinion authored by Mr. Justice Traynor, which says in part: ''In my opinion, however, the obligation in the present case did not terminate on death or remarriage, for the parties 'otherwise provided.' True, they did not specifically mention death or remarriage, or any other contingency, but by providing that the payments should continue until the 'first day of July, 1956' they agreed that the payments were not to terminate for any reason before that date. By specifying that date, they necessarily precluded any other.'' (P. 84.) But the majority ''reversed with directions to the trial court to enter judgment in accordance with the views herein expressed.''

Thereupon counsel for plaintiff, the respondent on that appeal, filed a vigorous petition for rehearing which made the point among others that the trial court had erred in excluding the testimony of Mr. Brewer, who drew the instruments and participated in the negotiations leading to the agreement, and that his testimony ''would lend additional substantial support to respondent's contention that the payments to have been made by Mr. Hilton were in lieu of his wife's claimed interest in certain community property''; that this point ''has not been discussed during the course of this appeal inasmuch as respondents prevailed at the trial and before the District Court of Appeal''; also, ''[i]f the Supreme Court is of the opinion that the evidence previously admitted at the trial of this action does not support the present finding, surely Mrs. Hilton should have an opportunity for a retrial with all relevant evidence before the trier of fact!'' Counsel prayed *inter alia* ''that the Supreme Court modify its decision herein and remand the cause for a new trial.'' The court denied a rehear-

ing but struck the words "with directions to the trial court to enter judgment in accordance with the views herein expressed," thus leaving the decision a flat reversal, which connotes a right to a new trial (4 Cal.Jur.2d, § 666, p. 551).

"It has long been the law of this state that an unqualified reversal remands the cause for a new trial (*Faulkner* v. *Hendy*, 107 Cal. 49, 54 [40 P. 21]), and places the parties in the trial court in the same position as if the cause had never been tried, with the exception that the opinion of the court on appeal must be followed so far as applicable (*Sharp* v. *Miller*, 66 Cal. 98 [4 P. 1065]; *Estate of Pusey*, 177 Cal. 367 [170 P. 846])." (*Central Sav. Bank of Oakland* v. *Lake*, 201 Cal. 438, 443 [257 P. 521].)

As all the justices of the Supreme Court construed the agreement as matter of law and the majority held that the payments thereunder terminated upon the death of Mr. Hilton, that phase of the case normally would not be open to recanvassing upon a new trial—the doctrine of law of the case would forbid. But that rule is not universally applicable.

*England* v. *Hospital of Good Samaritan*, 14 Cal.2d 791, 795 [97 P.2d 813], explains as follows: "The doctrine of the law of the case is recognized as a harsh one (2 Cal.Jur. 947) and the modern view is that it should not be adhered to when the application of it results in a manifestly unjust decision. (*United Dredging Co.* v. *Industrial Acc. Com.*, 208 Cal. 705 [284 P. 922].) However, it is generally followed in this state.

But a court is not absolutely precluded by the law of the case from reconsidering questions decided upon a former appeal. Procedure and not jurisdiction is involved. Where there are exceptional circumstances, a court which is looking to a just determination of the rights of the parties to the litigation and not merely to rules of practice, may and should decide the case without regard to what has gone before." *Vangel* v. *Vangel*, 45 Cal.2d 804, 809 [291 P.2d 25, 55 A.L.R.2d 1385], is to the same effect.

The ruling of the Supreme Court upon its face precludes oral evidence in aid of interpretation of the agreement in question because all justices agreed upon the one proposition that the written agreement was to be construed as matter of law. Cases cited by respondent to the effect that it is always open to a trial court to determine whether a property settlement agreement is an integrated one or whether any of the agreed payments are severable ones for support and maintenance (e.g., *Messenger* v. *Messenger*, 46 Cal.2d 619 [297 P.2d

988], *Fox* v. *Fox,* 42 Cal.2d 49 [265 P.2d 881], *Dexter* v. *Dexter,* 42 Cal.2d 36 [265 P.2d 873], *Taliaferro* v. *Taliaferro,* 125 Cal.App.2d 419 [270 P.2d 1036]) are not quite in point, for none of them involved parol evidence upon the meaning of an instrument which a reviewing court had construed as matter of law. The Supreme Court did not expressly or impliedly rule out the law of the case by its modification of the opinion. There must be some good reason for departing from the law of the case. Counsel cite no precedent which recognizes the propriety of a trial judge's receiving oral evidence upon the meaning of a writing which has been construed on appeal as a matter of law, and we know of no such case.

But we apprehend that the revealing of an ambiguity, a latent one (see 18 Cal.Jur.2d, § 276, p. 765), that was not before the appellate court, well may afford ground for departing from the rule, especially where, as here, failure to do so might result in injustice to one of the parties. It is evident from the present record that we have a serious and bona fide dispute as to the meaning of the settlement agreement and that brings into play the rule of *Beneficial etc. Ins. Co.* v. *Kurt Hitke & Co.,* 46 Cal.2d 517 [297 P.2d 428], and similar cases. It is said in *Hitke,* at page 524: " 'As the court said in *California Emp. Stab. Com.* v. *Walters, supra* [64 Cal.App.2d 554 (149 P.2d 17)], *"[t]he very fact, however, that plaintiff questioned the meaning of certain words and clauses used in framing the agreement in itself shows that it was ambiguous . . . ."* ' " (Italics by court.) *Reid* v. *Overland Machined Products,* 55 Cal.2d 203, 210 [10 Cal.Rptr. 819, 359 P.2d 251], says: "When the language used in the contract is fairly susceptible to the construction claimed by one of the parties, extrinsic evidence may be considered, not to vary or modify the terms of the agreement, but to aid the court in ascertaining its true meaning. (*Beneficial etc. Ins. Co.* v. *Kurt Hitke & Co.,* 46 Cal.2d 517, 524 [297 P.2d 428].)"
 Under this doctrine there was basis for the court's receiving parol evidence at the second trial, and it is immaterial whether the judge pursued this line of reasoning or not; if he ruled correctly that is all the law requires.

 Plaintiff from the beginning of the suit was claiming that commissions payable to the husband aggregated $49,000 and were community property; he claimed they did not exceed $9,000. Plaintiff herself was barred by the dead man's statute (Code Civ. Proc., § 1880, subd. 3) from testifying, but her

attorney, Mr. Brewer, participated in the negotiations with Mr. Hilton and was qualified to testify. He said that on Saturday, July 25, 1953, two days before the hearing on the order to show cause, Mr. and Mrs. Hilton called at his office and after some period of silence on the part of everybody Mr. Brewer said: "I understood you came here to make a property settlement. Has any been made? Mrs. Hilton said, 'No.' I said, 'What are we here for?' So Mr. Hilton said, 'Well, I have been through all this once before. I am not going to pay any alimony, I can't pay any alimony.' He said, as I recall, he said he was on a drawing account and he hadn't made any sales for many months, drawn no commission, that he was in debt and couldn't pay his debts, he had to have something to live on and to entertain customers." We quote the principal portions of the remainder of Mr. Brewer's testimony: "I said, 'Well, if you are not to pay anything and you can't pay anything, I think the best thing for you to do is go see a lawyer, I shouldn't be talking to you, anyway, it was your request for a meeting.' He said, 'I have already seen a lawyer.' I said, 'Well, did you talk to him about this, the things you told me?' He said, 'Yes, I have.' I said, 'Well, why isn't he here?' He said, 'Well, I didn't want him to come here; he told me to go ahead with it.' I said, 'I am sorry, but this kind of talk is a waste of my time, and I am not going to spend any more time on it. We are through with our conversation,' something to that effect, because obviously there was nothing to talk about. So he said that, well, he would give her something. I said, 'Well, if you have a proposition to state, state it, and let us get this over with, because, obviously we are never going to get anywhere.' So it is my recollection he said he would give her two hundred a month for a year. And I told him I would rather withdraw from the case than even discuss such things, because obviously the community property was very great and how about that? Well, he wasn't going to admit, he said, 'I am not going to admit there is any community property.' I said, 'How about the retained commissions?' He said that was $9,000, but he said, 'That is something that just the company has control of.' I said, 'Well, of course, there is supposed to be a lot of sales have been made on which commissions are due but haven't become due because of lack of delivery, and also there are commissions due.' And he denied that there was any such at all. . . . And I said, 'Well, even if we reached an agreement, we would have to have you go to a lawyer and have it okayed.'

He said, 'I don't need that and I don't want it, I have been through all this before. I am not going to pay any alimony.' I said, 'Well, then, we will just have to go to court. I am certain you understand what will happen up there.' He said, 'Yes, I know.' So finally I said, 'Well, if there is nothing to talk about, let's adjourn this meeting.' . . . We will meet you in the courthouse on Monday.' So then he said, 'Well, I told you I am not going to pay any alimony.' I said, 'Well, all right, but how about community property? What about that?' 'Well,' he said, 'there wasn't any.' . . . And finally he said, well, he would make it a little more. I said, 'No. How about taking them [commissions] as of community property, that would be five hundred a month, that is for four years, that would be $24,000, it was just about half of the sums which I set up here in this affidavit of 19,000 plus 5,000 plus 25,000, and she gets one of the cars, you get one of the cars. . . . Then I think it was Mrs. Hilton said, well, she would take her share of the property—oh, I overlooked one thing he said. He said he couldn't pay anything in cash to divide community property, he would have to pay it in payments. I think it was Mrs. Hilton finally said she would take four hundred a month for five years, which would be—for four years—which would be considerable less than the other that I had suggested. Mr. Hilton said no he wouldn't do that. I again said, 'Mr. Hilton, I think you should see your own attorney and we should meet you up there; after you have had his advice maybe we can get somewhere.' He said, 'No, I want to settle this today.' He had said that several times, very anxious to settle that that day. Finally, he said he would give this three hundred a month for three years, I believe it was, something like that, at any rate, I have it here, that is, from October 1st to the 1st of July, 1956. It amounted to a little over $10,000 as her share of the community property, and he was not going to go for any alimony, he was very bitter about it. He said, 'I am very bitter about the way I got taken in my other divorce,' . . . And she said, 'Well, I will take it.' So I said, 'Well, this is a pretty bad deal, I will try to see if I can get it out, and I don't know whether I can or not.' . . . I said, 'I will have to get out a stipulation, you will have to sign it, you will have to appear on Monday and tell the Court this is satisfactory to you, because you don't have an attorney, and I won't go through with it except under those circumstances.' And then I drew this stipulation and the property

settlement agreement, at that time didn't have much time, and I gave the girl a little form to go by and outlined to her the figures to put in, and things like that, the data, and she followed the form. . . . I told him again he should present it to his lawyer first. He said, 'no,' he wanted to sign it and get rid of it, and he did sign it, both papers, on that day. . . . Well, he was there, as I recall it, on Monday, and he stood up, and I talked to the Court in his presence.''

The language of paragraph I of the agreement and the matter immediately preceding it (quoted above), are strongly suggestive of the use of a form which Mr. Brewer had handed his secretary. Other portions of the agreement (footnote 1) are consistent with either party's interpretation of paragraph I.

It is settled law, not affected by the 1951 amendment to section 139, Civil Code, that a property settlement agreement which provides for periodic payments of the wife's share of the property and for no other payments is not an "integrated agreement" (which term is defined in *Plumer* v. *Plumer,* 48 Cal.2d 820, 824 and 825 [313 P.2d 549]) and the prescribed payments do not terminate upon death or remarriage. See *Ettlinger* v. *Ettlinger,* 3 Cal.2d 172, 177 [44 P.2d 540]; *Puckett* v. *Puckett,* 21 Cal.2d 833, 840 [136 P.2d 1]; *Adams* v. *Adams,* 29 Cal.2d 621, 625 [177 P.2d 265]; *Plumer* v. *Plumer, supra,* 48 Cal.2d 820, 823; *Hamilton* v. *Hamilton,* 94 Cal.App.2d 293, 299 [210 P.2d 750]; *Hawkins* v. *McLaughlin,* 196 Cal.App.2d 318, 322-323 [16 Cal.Rptr. 572]; 3 Witkin, Summary of California Law (7th ed.) section 136, page 2679.

The evidence substantially supports the trial judge's finding that ''[i]t is not true that the payments made by decedent under the terms of said property settlement agreement or judgment were for the support or maintenance of plaintiff. It is true that said payments were made by decedent as installments on account of plaintiff's interest in the community property of the parties and on account of the settlement of plaintiff's interest in the marital property of the parties.'' Referring to the written stipulation the court also found upon sufficient evidence: ''[I]t is not true that such payment was for the support or maintenance of plaintiff or that such payment was a provision for alimony. It is true that such provision for payment was intended by the parties to be and the same was solely in lieu of plaintiff's interest in the community property of the parties and in settlement of plaintiff's interest

in the marital property, and not otherwise.'' There is nothing startling about this conclusion, for the courts, in canvassing the question of whether an agreement was integrated, have repeatedly held that a provision made avowedly for support and maintenance was in fact a division of community property payable in installments, as witness *Ettlinger* v. *Ettlinger, supra,* 3 Cal.2d 172, 177-178; *Dexter* v. *Dexter, supra,* 42 Cal. 2d 36, 39, 41-42; *Fox* v. *Fox, supra,* 42 Cal.2d 49, 52-53; *Messenger* v. *Messenger, supra,* 46 Cal.2d 619, 625, 628; *Tuttle* v. *Tuttle,* 38 Cal.2d 419, 422 [240 P.2d 587]; *Hamilton* v. *Hamilton, supra,* 94 Cal.App.2d 293, 299.

This was not, as contended by appellant's counsel, the making of a new contract for the parties or a revision of the existing writing. It was but a determination of what the parties really meant by what they said. The holding that the agreement to make the $300 payments did not terminate upon death of the husband or remarriage of the wife is sustained by the facts and the law.

Judgment affirmed.

Fox, P. J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 2, 1962. Traynor, J., was of the opinion that the petition should be granted.